KEVIN J. MIRCH, ESQ.
NV. Bar No. 000923
320 Flint Street
Reno, Nevada  89501
(775) 324-7444

Plaintiff in pro per

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

KEVIN J. MIRCH, ESQ.     )
           )
  Plaintiff,      )
           )
 v.         )Case No. CV-N-05-641 -RLH-
           )       (RAM)
           )
BRUCE BEESLEY,     )
ROB BARE, BRIDGET ROBB PECK, )
DONALD  CHRISTENSEN, STATE BAR )
OF NEVADA, DOES I -X    )
A-Z Corporations,     )
           )
  Defendant.     )
_____)

## **FIRST AMENDED COMPLAINT FOR DAMAGES.**

KEVIN J. MIRCH, in pro per, alleges, avers, and complains as follows:

## **PARTIES**

_____1. Plaintiff, Kevin J. Mirch, Esq., at all times relevant hereto was a resident of Washoe County, State of Nevada.

2. Defendant, Bruce Beesley, Esq., at all times relevant hereto has been a resident of Washoe County, State of Nevada.

3. Defendant, Bridget Robb Peck, Esq., at all times relevant hereto was a resident of Washoe County, State of Nevada.

4. Defendant, Robb Bare, Esq.,  at all times relevant hereto was a resident of Washoe County, State of Nevada.

5. Defendant Donald Christensen, at all times relevant hereto was a resident

1

of Clark County, State of Nevada.

6.    Defendant DOES I- X at all times relevant hereto were  residents of Washoe County, State of Nevada.  Donald Christensen works for the City of Reno, City Attorney's Office.

7.    Defendant  A-Z  Corporations,  at  all  times  relevant hereto were corporations duly and validly existing in the County of Washoe County, State of Nevada.

8.    Defendant, the State of Bar of Nevada, at all times relevant hereto was a corporation duly and validly existing in the State of Nevada, County of Washoe.

The following claims for relief apply to each of the Defendants, unless stated elsewhere.

## JURISDICTION

9.    This action arises under the laws of the United States. The jurisdiction of the Court is based, in part, upon its authority under 28 U.S.C. § 1337 to hear "any civil action or proceeding arising under any Act of Congress regulating Commerce or protecting trade and commerce against restraints and monopolies. Kevin J. Mirch, Esq.,  brings this action under Section 4 of the Clayton Act (15 U.S.C. § 4) to recover damages incurred as a result of violations by the Defendants of Section 1 of the Sherman Anti-Trust Act, (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §4 and 16) to secure equitable relief against a continuation of those violations to the Defendants' conducting of  malicious retaliatory conduct designed to obstruct Mr. Mirch's business by obstructing the litigation  which the Defendants cannot win without the help of the State Bar, Northern Nevada Disciplinary Panel.

10.    Defendants' conduct is designed to cause economic harm to Kevin J. Mirch,  Mirch & Mirch, and its clients, who have been successful in high profile cases and to prevent Mr. Mirch from continuing to practice law without fear of retribution from Judges, the State Bar Association, and politically potent individuals

who hold positions of substantial power and large corporations with substantial political power.

11.    At all times relevant to this complaint, Plaintiff and Defendants transacted business, within interstate commerce by representing a substantial number of out of state (Nevada, New Jersey) clients, and receiving monies from the same. Kevin J. Mirch and Mirch & Mirch rendered services, purchased legal materials, including but not limited to the services of California attorneys, paid for equipment and other office materials, including lodging while attending legal hearings, meeting with witnesses, and appearing before subcommittees of the United States Federal Government which affected the flow of interstate commerce and which forms an integral part of the interstate distribution of such services and products which are manufactured, sold and flow in a continuous and uninterrupted stream of interstate commerce.

12.    Each of the claims for relief set forth in this Complaint are derived from a common nucleus of operative facts involving substantially identical issues of fact and law such that one would ordinarily be expected to try them in one judicial proceeding. Consequently, the entire action constitutes a single case wherein all claims should be combined and tried together in the interests of judicial economy, convenience, fairness and in order to avoid unnecessary duplication and multiplicity of actions. Therefore, this Court has ancillary jurisdiction over all state law claims asserted herein.

13.    Venue is proper in this Court pursuant to 28 U.S.C.A § 1391(b) because Plaintiff resides in this district and because each of the Defendants live and work in this district. Venue as to each Defendant is proper in this judicial district pursuant to the provisions of Title 15 U.S.C. §22 and Title 28 U.S.C. §1391(b) and © in that each of the Defendants transact business, are registered and/or licensed to transact business and are found in this judicial district. The unlawful activities done pursuant to the

conspiracy and course of conduct herein alleged were carried out within the State of Nevada, and in interstate trade and commerce was and is carried on within the Northern District of Nevada.

14.    Many of the acts of wrongdoing alleged herein occurred by mail or over the telephone.

15.    The Jurisdiction of this case is also conferred by Sections 28 U.S.C. Section 1331, 1343(3) and (4), and 42 U.S.C. Section 1983, 28 U.S.C. Sections 2201, 2202, the fifth and fourteenth amendments to the United States Constitution. Specifically, Plaintiff brings this action to secure equitable relief from actions initiated by defendants under color of law, which are violative of rights, privileges, and immunities guaranteed him by the United States Constitution, and directly under and through Article I, section 10, Clause 1 and the First and Fourteenth amendments to the United States Constitution.

## **FACTS**

16.    For the past 20 years, Plaintiff has been an attorney licensed to practice law in the States of Nevada and California.

17.    Plaintiff, Mirch, has a been a certified public accountant licensed to practice within the State of Nevada for over 20 years.  Mr. Mirch has not be subjected to discipline with in the State of Nevada for 20 years by the State Board of Certified Public Accountants.

18.    For the past 20 years, Plaintiff has been involved in high profile cases against Prudential Insurance Company, Bank of America, Wells Fargo Bank, Lloyds of London, The State of Nevada, SuperShuttle the United State of America-Internal Revenue Service, the State Bar of Nevada, International Game Technology, Acres Gaming, Aristocrat Gaming, Inc.,  and  Hospital Corporation of America.

19.    Mr. Mirch has won millions of dollars for his clients and against Prudential Insurance Company of America, Bank of America, Wells Fargo Bank,

4

International Game Technology, Acres Gaming, Aristocrat Gaming, Inc., Paris Casino (Caesars Casino), Lloyds of London,  Internal Revenue Service, Washoe County (State of Nevada), Nevada Attorney General's Office,  and Hospital Corporation of America (HCA). This is not an exhaustive list.

20.   The litigations involved extremely political issues and large business issues.

21.   Mr. Mirch and his family have been subjected to a bombing. Washoe County refused to prosecute  the offender who admitted to committing  the crime because Mr. Mirch was litigating an action against Washoe County.  The action against Washoe County was  for the wrongful termination of Charles Wiseman who was in charge of collections within Washoe County, Nevada, discovered missing funds from numerous public funds and courtrooms;  was terminated when he insisted upon disclosure and prosecution of politically potent individuals; and finally moved to Mexico to avoid threats against himself and his family. Mr. Wiseman's case is pending at the Nevada Supreme Court.

22.   After winning a number of substantial cases,   a scheme was devised against Mr. Mirch  to prevent him from practicing law within the States of Nevada and California and knowing that any restriction on his Nevada legal license would impact his ability to practice law in California where he is also licensed.  Essentially, reciprocity would impose the same burdens upon Mr. Mirch for practicing properly and whistle blowing.

23.    For the past 20 years Plaintiff has been successful in defeating the largest law firms in the world (Baker McKenzie) as well as the largest firms in Nevada (Lionel, Sawyer Collins).

24.    As a result of regularly defeating these firms in jury trials, a scheme was devised to  cause harm to the reputation, practice, and legal license of Mr. Mirch and his firm Mirch & Mirch.

///

## INTERFERENCE BY POLITICALLY ESTABLISHED ATTORNEYS WITHIN THE STATE BAR ASSOCIATION

25.    Over the last 15 years over more than a dozen  frivolous disciplinary complaints have been filed, reviewed, and prosecuted by the State Bar of Nevada against Mr. Mirch and his wife, Mrs. Mirch. Mrs. Mirch practices law with Mr. Mirch as his partner.

26.  Each of the complaints  have been frivolous and are intended to cause Mr. Mirch to move from the Reno area; to cause severe physical and mental harm to Mr. Mirch; to protect businesses from committing crimes; and to protect members of the large companies that supported the certain corrupt members of the judiciary, bar and business from being litigated against by Mr. Mirch.

27.    Mr. Mirch attended University of Nevada (undergraduate) and New York University for his LL.M. in Taxation. Mr. Mirch is a Certified Public Accountant.

### Undisputed History of Obstruction of Justice Against Mr. Mirch

28.    When Mr. Mirch first started to practice law within the State of Nevada during 1985, he received a disciplinary notice which stated that it was illegal, and a violation of Nevada Bar Rules to allow anyone to know that he was an attorney as well as a Certified Public Accountant.

29.    For over 20 years Mr. Mirch has not been allowed to disclose on letterhead, office materials, or in other promotional matters that he was a Certified Public Accountant/Attorney.

30.    After complaining that he had a right to list his credentials, Mr. Mirch was threatened by Leonard Gang, Esq., bar counsel or a member of the Board of Governors or both that if he disclosed that he was an attorney and certified public accountant that the State Bar of Nevada would find a way to revoke his license.

31.    At the time Mr. Mirch was struggling with a small practice, a wife and three children.

32.    Mr. Mirch obeyed the false order and statement of law to avoid further harm to his law practice and to shield his children from obvious harm and embarrassment associated with bar discipline.

33.    The attacks upon Mr. Mirch were so relentless that he was forced to take cases in California, where he was successful in obtaining verdicts, normally reserved for the attorney hierarchy.

34.    Mr. Mirch represented the Defendants/Counterclaimants in an action entitled Universal Sales International, Inc. (USI) v. APPI and Dr. Kenneth Frank, in the United States District Court District of Nevada.    APPI and Dr. Frank were Counter claimants against the Brooks/USI, but nonetheless obtained a judgment after several years of litigation in excess of $2.5 million dollars.

35.    This pending case flows in most part from that action. See below.

36.    As Mr. Mirch's success in jury verdicts grew, he became known as an attorney that would not sell out his clients; would try cases when appropriate; and would work unbearable hours.

**<u>Whistle Blower</u>**

37.    Over the years Plaintiff has disclosed illegal conduct within the legal system which has caused irreparable harm to his practice in the form of intentional retaliation by members of the State Bar of Nevada, Northern Nevada Disciplinary Panel; Rob Bare, Esq, its counsel; and other "preferred attorneys" and firms such as McDonald Carano, Pat Lundvall, Bruce Laxalt, Sarah Beth Brown, Bruce Beesley, Esq., Bridget Rob Peck, Esq., Judge James Hardesty, Judge Stephen Kosach; and others described herein.

38.    Mr. Mirch has advised the Federal Bureau of Investigation, the Washoe County District Attorney's Office, Senator Harry Reid, Retired Senator Bryan; Mills

Lane, Esq., 2 Washoe County District Attorneys; 2 Attorney Generals (Judge Bryan Sandoval and Frankie Sue Del Papa, Esq.),  Supreme Court Justices Rose, and Charles Springer)  that certain members of the Bar Association were using the State Bar, Northern Nevada Disciplinary Panel, as a weapon to gain an advantage in litigation within the State of Nevada.

39. Specifically, the Defendants arranged a scheme whereby Mr. Mirch would be prevented from litigating matters that had political, "preferred attorney adversaries", and/or substantial clients by threatening criminal action, bar action, and disbarment if Mr. Mirch not only litigated a case, but agreed to take a case; or insisted upon following an order issued by a honest/competent judge.

40. Mr. Mirch was particularly threatened if he took pro bono cases involving public fraud or the mismanagement of money by the State of Nevada, Washoe County, or any related entity.

41.   These Defendants intended to cause  the State Bar of Nevada and Members of the Nevada Supreme Court to impose discipline on  Mr. Mirch, thus preventing him from representing deserving members of the public.

42. Over the years Mr. Mirch had represented retired physicians who had lost privileges at local hospitals for disclosing illegal conduct including sexual misconduct by other physicians, medicare and medicaid fraud.  The result was a direct and immediate attack by the State Bar of Nevada, Northern Nevada Disciplinary Panel in order to prevent other similar cases from being filed.  The District Attorney's Office and Attorney General's Office refused to interject, and actually interfered because political obligations prevented the same.

43.   Currently, Mr. Mirch is involved in litigation which if successful would have a substantial adverse impact upon the gaming industry in the State of Nevada (manufacturing) and its Casinos (falsifying markers).  The State Gaming Control Board and Commission, through the Nevada Attorney General's Office refused to

prosecute illegal conduct by hospitals and casinos that were readily violating state and federal statutes.  Though aware of the illegal conduct readily occurring within the State of Nevada, attorneys continue to threaten Mr. Mirch, his family, and to pursue similar bar discipline action.

### Undisputed  Obstruction of Justice

44.    On or about December 23, 1991, Garrett Sutton, Esq., confirmed by sworn affidavit that he had been approached by  Bruce Beesley, Esq., an insurance defense attorney with strong personal ties to International Game Technology, the Nevada State Bar Association, and the State of Nevada Northern Nevada Disciplinary Panel, and was encouraged to cause substantial harm to Mr. Mirch's legal career.  At the time,  Mr. Beesley was counsel for  IGT in a case entitled *IGT v. the Gold Club Casino*, CV 91-3641, Second Judicial District Court, State of Nevada.

45.  Mr. Beesley advised Mr. Sutton  that IGT would settle with his client, Dr. Stuart Wyckoff, for $60,000, even though it alleged over  $200,000.00 was owed by the Gold Club Casino to IGT if he would file a Bar Complaint against Kevin Mirch with the State Bar of Nevada.  The Bar Complaint had to be filed before trial began against IGT and caused Mr. Mirch severe emotional stress and/or his ability to practice law in Nevada or any other State.

46.  Mr. Sutton declined and advised Mr. Mirch that on December 19, 1991, that he overheard a conversation from between John Cavanaugh, owner of the Gold Dust West, that Mr. Cavanaugh had been told or heard that it was IGT's strategy in the *IGT v. Gold Club Casino Case*, supra,  to win by causing Mr. Mirch  serious trouble with the Nevada State Bar, Northern Disciplinary Panel,  so that he would be unable to litigate or would be so upset that he would be uneffective.  The conduct by Bruce Beesley, Bridget Robb Peck, his partner,  and the State Bar of Nevada, Northern Nevada Disciplinary Panel, was unethical, civilly actionable, and constituted the crimes of extortion and obstruction of evidence.

47.    Mr. Sutton provided the Sutton affidavit to the State of Nevada Bar Association which was eventually was provided to Senator Harry Reid and other politicians.

48.    The Nevada State Bar Association and Senator Reid failed to pursue the matter as the Bar was a political ally with substantial voting and monetary power.

49.    In the meantime, a number of Mr. Mirch's clients were harassed, threatened, and told to lie in order to cause harm to Mr. Mirch and Mirch & Mirch.

**Forman v. Roth**

50.    On or about June 27, 1995, Mr. Mirch was again threatened when he refused to lie under oath in a case entitled *Forman v. Roth, In the Second Judicial District Court, State of Nevada*.

51.    In the *Forman v. Roth* matter, Mr. Forman provided an affidavit to the Nevada State Bar Association which stated:

> "Immediately prior to Mr. Mirch's deposition, I overheard a conversation Mr. Lattin was having with Gerald Roth, Jr. I was on the phone in the conference room and Mr. Lattin was discussing Mr. Mirch's anticipated testimony. Mr. Lattin was near the door to the conference door. In that conversation , Mr. Lattin told Mr. Roth not to worry about Mr. Mirch. **He stated that if Mr. Mirch testified against Mr. Roth that we would have a problem with the Bar Association. He stated that he had knowledge that Mr. Mirch had experienced Bar problems.** He further disclosed that one of his partners was involve with the ethics board and would "fuck" Mr. Mirch if he testified against Mr. Roth. Mr. Roth Seemed to encourage that course of conduct and at that point Mr. Roth Laughed. ....    I understand that during the course of my litigation with Mr. Roth, that Mr. Lattin openly threatened my attorneys with state bar actions.

52.    Mr. Forman sent a letter to Supreme Court Justice Springer who then asked Mr. Olendorff of the State Bar of Nevada to investigate the same.

53.    Mr. Olendorff refused to investigate the matter despite assigning special prosecutor to conduct an investigation.   The results of that investigation have remained private for several years.

54.    As a result Mr. Forman suffered retaliation.

55.    Mr. Forman received a jury verdict which was improperly reversed by the

Court for allegedly lacking sufficient evidence.

56.    Mr. Forman lost over $300,000.00 of damages when including attorney fees and costs. This loss resulted in Mr. Forman's business failing or having to be sold (Granny's House Recording Studio).  This was a high profile business that was a proud member of the Reno business community.

57.    As Mr. Mirch represented the partnership he refused to take any sides in the case, but nonetheless was subpoenaed by Donald Lattin into a deposition and eventually trial.

58.    On June 27, 2005, Lorraine Arms, a noted business personality in the Reno area provided an affidavit which confirmed the attacks made against Mr. Mirch by members of the Nevada State Bar Association.  In an affidavit provided to the Bar, the Nevada State Supreme Court, Ms. Arms admitted the following:

> 6.    During the settlement discussion, Mr. Roth Disclosed that Mr. Mirch had bar problems and would have problems testifying on my behalf. **Also, I received a letter from Mr. Roth which threatened a bar action against my attorneys if they continued with the litigation**. In addition, I received threats against my husband and other companies that I owned if the litigation continued. **[Emphasis added].**

59.    Mr. Mirch truthfully testified in the *Forman v. Roth* case.

60.    Shortly thereafter, Mr. Mirch was wrongly charged by the Nevada State Bar, Northern Nevada Disciplinary Panel with wrongdoing related to a trust matter.

61.    The disciplinary panel appointed against Mr. Mirch included Mr. Malloy who was a partner in the law firm that had threatened Mrs. Arms, Robert Forman, James Zebrowski, and Mr. Mirch if they testified against their client Jerry Roth.

62.    Mr. Mirch was not informed that Mr. Malloy was the subject of an investigation prior to his disciplinary matter being heard, nor that threats had been made if he truthfully testified in the *Forman v. Roth* trial.

63.    Mr. Malloy had a duty not only to disclose his conflict with Mr. Mirch during the disciplinary matter, but also that a special prosecutor had been appointed

1   in a case involving his firm and  Judge Whitehead. Instead, of properly investigating
2   these matters, an attempt to go after Mr. Mirch was undertaken.

3
4                        **Boyer v. Bank of America**

5        64.    Later, Judge Whitehead was charged with misconduct in an unrelated
6   matter that Mr. Mirch had successfully obtained a very large verdict against Bank of
7   America for its wrongdoing.   See *Boyer v. Bank of America, In the Second Judicial*
8   *District Court, In and For the County of Washoe, State of Nevada*.

9        65.   Bank of America was represented by Vargas Bartlett and Dixon, now
10   known as Jones Vargas.

11       66.   Randall Jones, the son of one of the founders of Jones Vargas,  represents
12   Caesars in the marker fraud case pending before the Ninth Circuit Court of Appeals
13   in San Francisco.  In that case, Mr. Mirch obtained an $8,000,000.00 verdict which
14   was eventually overturned on questionable grounds.

15       67.    Without knowing this information, Mr. Mirch received a recommendation
16   for suspension, which  penalty was  reduced for by the Nevada Supreme Court. The
17   charge was that Mr. Mirch had not funded a trust prepared by his office.  Mr Mirch did
18   not fund the trust as he was never provided any assets or money to fund the trust. It
19   was impossible for Mr. Mirch to be charged since he controlled no assets of the client
20   and he had no  duty or agreement to do any more than prepare estate documents. Mr.
21   Mirch refused to hold client funds in order to protect himself. Instead, the State Bar,
22   Northern Nevada Disciplinary Panel used that fact to cause harm to Mr. Mirch, his law
23   practice and family.

24       68.  One of the Judges, Mr. Malloy was aware that his own firm did not fund
25   revokable living trusts, yet caused Mr. Mirch to receive discipline.  Essentially, Mr.
26   Malloy and other members of the State of Nevada Northern Nevada Disciplinary Panel
27   were aware that a different standard was imposed upon Mr. Mirch than Mr. Malloy's

28                                       12

firm, Walther, Key, Maupin, et. al.

69.  Mr. Mirch provided a written letter which proved that the Maupin firm did not fund revokable trusts, but received no discipline for the same because funding was not the standard of care at that time.  The letter was ignored and instead, Mr. Mirch was subjected to different rules because of his success against businesses and their counsel operating outside the law had created problems having a substantial financial impact upon certain "preferred attorneys" and companies.

70.  Since that date, Mr. Mirch has been repeatedly maligned and subjected to disciplinary complaints despite  repeatedly large verdicts against "preferred attorneys" and their clients (e.g., Beesley and IGT).

71.  Following his discipline, Mr. Mirch inadvertently learned that Mr. Beesley had arranged for discipline and bragged about it with an insurance company in order to obtain the client's business.  See *Rutherford v. Greentree Insurance*, In the Second Judicial District Court, in the State of Nevada, County of Washoe.

## Sworn Documents Proving that high ranking members of the Bar were Mis-Using the State Bar Association and State Supreme Court to Obstruct Legitimate Cases

72.  On October 7, 1998, Pete Sullivan, Esq., attorney working for Attorneys Bruce Beesley and Bridget Robb Peck filed an affidavit that admitted that Mr. Mirch was being set up by firms using the Nevada Supreme Court and the State of Nevada Northern Nevada Disciplinary Panel in order to avoid losing cases and to obtain clients.

73.  In a case entitled *Green Tree Vendor Services v. Rutherford*, CV97-05589, a letter was attached to an affidavit which advised Green Tree to wait before suing, Dr. Rutherford as the Beesley firm  was in the process of causing Mr. Mirch to be disbarred:

2-14-96     TT Erick./ this firm is on hold until **Lessee's Atty is suspended or disbarred.** Notorious for Filing Counterclaims, ETC. Disbarment

Proceedings going on right now and they should know shortly what happened we will advance 2 mo until this occurs.

8-2-95 Dric cld to discuss ACCT sd debtors Aty is **up for Disbarment-thinks** we should wait 30 days and see what happens — feels that there will be a counter claim against us and prob the law firm sdin past past experience w/this clown. It will cost An arm and leg Defending SD will follow up w/me in 30 days & we can make decision.

7-11-95. RE cl **F/sid kisster (Gordon & Silver)** he cld to adv that they have complaint ready to be filed but till they should let us know that **kevin mirch is a sociopath & will def counter sue us & atty firm and will be seeking punitive Damages SD** they have had dealing S w/him before and he is nuts SD will want to depose me and credit officer and pres of co SD will prob cost quite a bit to defend -SD we would probably prevail but they are concerned about the cost & wanted to make us aware of it. SD will have Eric tough Base w/me when he gets back next wk

[Note: the language is in short form used by the insurance adjuster]

74.    This note was accidentally sent to Mr. Mirch.

75.    On November 25, 2007 Plaintiff Mirch advised Senator Reid of the threats against himself, Robert Forman, Lorraine Arms, Archie Granata and James Zebrowski. Rob Bare, Esq., Counsel for the Bar Association was advised of the same misconduct. Neither Bare, Senator Reid, nor any member of the Nevada Supreme Court took any action. Instead, Senator Reid, Bruce Beesley, Bridget Robb Peck, and Rob Bare encouraged the misconduct as it protected IGT, Bank of America, Wells Fargo Bank and Greentree  from allegations that they were facing.

76. Had Mr. Mirch used the State Bar, Northern Nevada Disciplinary Panel as Beesley, Peck, and Laxalt had to attempt to cause another counsel to be disbarred simply because he feared their legal skills, he would have been disbarred.

77.    Mr. Beesley and Ms. Peck should have been disbarred for this conduct. Instead, their misconduct was concealed from the public.

78.    Upon information and belief,  Rob Bare, Esq., Bruce Laxalt, Bruce Beesley, Bridget Rob Peck, Pat Lundvall, McDonald Carano, and members of the Judiciary that were working with these "preferred counsel";  were protecting IGT and other large contributors in order to prevent disclosure of defective equipment being sold at IGT and misuse by large firms of the Northern Nevada Disciplinary Panel to

protect casinos and hearty political contributors.

## Threats Against James Zebrowski resulting in the loss of Super Shuttle

79.    On July 17, 1995, Mr. James Zebrowski, the founder of SuperShuttle, and a client of Mr. Mirch's provided an affidavit to the State Bar, Northern Nevada Disciplinary Panel and Rob Bare, Esq., that threats had been made against himself and Mr. Mirch if he did not dismiss his litigation against Mr. Roth.  As is discussed above, Mr. Roth was represented by a politically powerful member of the State Bar of Nevada.  In an affidavit, Mr. Zebrowski provided as follows:

> 5.    In that same conversation, Mr. Roth informed me that his new law firm would cause problems for Mr. Mirch if he testified on behalf of Mr. Forman. I viewed this comments as being nothing less than extortion.
> 6.    Upon hearing this. I terminated the services of Mr. Mirch. Approximately, one year later, I did rehire Mr Mirch for an action involved in San Diego, California. Recently, Mr. Mirch tried that action to a $2,040,530.00 judgment in my favor. During the trial, I disclosed to Mr. Mirch the reason shy I had terminated him initially. At that time, Mr. Mirch became very upset and disclosed to me that he had in fact had serious problems with the State Bar and that he had been adjudged by members of Mr. Lattin's firm.
> 7.    Based upon the conversation with Mr. Roth, I now believe that a number of lawyers and witnesses may have been swayed through threats with respect to Mr. Forman's settlement in his action. Specifically, I recall Mr. Roth telling me the was going to "fuck" Mr. Forman, Lorraine Arms, and Kevin J. Mirch if they continued with the Forman action and would use his law firm to do this. I interpreted this to mean that his lawyers would use he Nevada State Bar Association to essentially win any action brought against Mr. Roth and his partner. Mr. Zenklusen.

## Kent Robison controlling Special Prosecutor Secretly Assigned

80.    On September 8, 1995, Mr. Forman learned from Mr. Lattin's counsel, Kent Robison that  he controlled the investigation by the special prosecutor when he wrote a letter to Mr. Forman which stated in pertinent part as follows:

> To keep this case moving expeditiously until the special prosecutor is appointed, I am arranging for the forwarding of this file to Steven Wolfson, Chair of the Nevada  Disciplinary Board, for his review of the potential grievance against Mr. Malloy.

Mr. Robison's contact with Mr. Wolfson was an improper contact with an independent

member of the Bar for one purpose - to gain an advantage in the litigation.

81.    Mr. Robison's power was improper and encouraged attacks upon Mr. Mirch simply for testifying truthfully.

82.    On September 11, 1995, Mr. Robison threatened Mr. Forman by providing: "Enclosed is a copy of an unfiled Complaint. If your retraction is not made and communicated to Ms. Olendorff and Justice springer on or before September 21, 1995, the complaint will be filed and zealously prosecuted. ... I have received information that you have not only defamed Mr. Malloy with your letter of August 28, 1995, but that you have also slandered Mr. Malloy in your various verbal comments to associated with the Kevin Mirch Case." This conduct constituted obstruction of justice which Rob Bare refused to prosecute.

83.    As a whistle blower, Mr. Forman was protected from such attacks from "preferred counsel".

84.    The Forman/Roth case ended with Mr. Forman obtaining a verdict in the amount of $200,000.

85.    Judge Whitehead reduced the verdict to zero claiming that damages had not been proven.

86.    Judge Whitehead's order occurred shortly after he sold his house to Mr. Forman's opposing counsel, Mr. Lattin.

### IGT v. The Gold Club Casino

87.    After the Forman/Roth case Mr Mirch was sued by IGT

88.    Mr. Mirch owned the Gold Club Casino.

89.    Mr. Mirch was sued for over $1,000,000.00.

90.    Mr. Mirch countersued IGT for defective equipment.

91.    The IGT equipment had held 1.7 % instead of 4.5%.

92.    Mr. Mirch won a jury verdict and was awarded damages from IGT when it was learned that IGT had sold used equipment previously owned by the Peppermill to

the Gold Club with notice that the same was not new nor that it was defective.

93.  During the litigation, Mr. Mirch was forced to close the Gold Club Casino for a lack of funds.

94.  Had the Gold Club Casino been sold new equipment it would have earned over $7,000,000.00.

95.  The IGT v. Gold Club Casino and Kevin Mirch case involved IGT selling used gaming equipment to the Gold Club Casino without his permission or knowledge, but charging the full price  Representing the Gold Club Casino was Mr. Mirch, in pro per. IGT was represented by Mr. Beesley and Ms. Peck.  Ten years later in the IGT v. Wild Game Ng, LLC, case it was learned  that IGT had continued to sell used equipment as new with substantial defects that were not disclosed to the public, other casinos, or customers.  Currently, IGT faces a world wide recall of all of its equipment, damages owed to other casinos, and to customers cheated by its machines.

96.  During that litigation, Mr. Mirch endured nearly one dozen bar complaints either encouraged or written by Mr. Beesley and Ms. Peck.

97.  Mr. Beesley and Ms. Peck worked for a large southern Nevada Firm when the Gold Club/IGT action commenced. After losing, Mr. Beesley and Ms. Peck were terminated.

98.  Despite the filing of the false Bar complaints, neither the State of Nevada, Northern Nevada Disciplinary Panel nor Mr. Rob Bare, Esq., initiated any action.

## Mr. Forman's Whistle Blowing

99.  On April 13, 1995, Mr. Forman advised CA Olendorff, Mr. Robison's appointed special prosecutor, that threats had been made against Ms. Arms and that the charges against Mr. Mirch had been considered "trumped up".  Later allegations prove that cases were actually timed to harm Mr. Mirch so that incompetent counsel would be successful in made up litigation. "If Mr. Mirch's trumped up charges are being considered by the Nevada Supreme Court, so should yours".  This letter was

1    provided to Dennis Arnoldy, FBI, Hon. Jerry C. Whitehead, Vivian Lynch, Justice

2    Rose, Justice Young, Justice Steffin, Justice Springer, Justice Shearing, and Robert W.

3    Bare, Esq.

### Mr. Mirch Discloses Threats if he testifies in the Roth/Forman action

4

5        100.   As a result of this disclosure of misconduct, Mr. Mirch has suffered

6    repeated charges of misconduct over 2 decades only because he has been enormously

7    successful in his litigation against corrupt politicians,  attorneys, and corrupt

8    businesses.

9        101.   In an affidavit dated July 17, 1995, Mr. Mirch provided an affidavit

10   which states in pertinent part as follows:

11           I was threatened by Donald Lattin, Esq. Mr. Lattin works for the Law
         Firm of Walther, Key, Maupin, and Oaks, attorney. Specifically, Mr. Lattin
12       called my offices and said that if I testified against Mr. Roth, I would have bar
         problems and be sued. He said he knew about my bar problem. The only way
13       he would have known about any problems with the bar would have been
         through Mr. Malloy.  Other individuals have also asked me about bar
14       investigations against me. I believe that Mr. Malloy has disclosed these
         investigations about Mr. Roth and other members of his firm.

15

### Obstruction of Justice

16

17       102.   As part of its ongoing methods of obstructing justice, the Defendants

18   participated in at least 4 substantial cases which had a severe impact upon the

19   Plaintiffs: *Wiseman v. Washoe County* (altering transcripts to avoid millions of dollars

20   from being stolen from Washoe County, State of Nevada); *Siena v. Acres* (sale of

21   defective gaming software by Acres Gaming Company which was owned and/or

22   controlled by IGT); *Clark v. HCA* (sexual molestation case caused by Hospital

23   Corporation of America, medicare fraud, medicaid fraud, Second Judicial District

24   Court Judges were improperly referring patients to the HCA facility while knowing

25   that the Medicare and Medicaid criminal charges were pending against that facility);

26   *IGT v. ACRES* (defects in gaming devices manufactured by IGT which altered profits

27   earned by preferred casinos and increased losses by casinos not preferred by IGT);

28                                         18

defects in computer boards which were hidden from the Gaming Control Board in order to prevent the public and other gaming regulators from other jurisdictions from learning that IGT was selling defective products.

### Wiseman v. Washoe County

103.    On or about 1998, Plaintiff Represented Charles Wiseman against Washoe County.

104.    The Wiseman case involved missing money from Washoe County.

105.    When Wiseman complained about the missing money, he was constructively terminated by making him dress as a woman and perform other degrading things.

106.    Mr. Wiseman sued Washoe County.

107.    Counsel for Washoe County manager John MacIntye retained Bonanza Reporting, Diane Brumley its owner,  as its court reporter

108.    Bonanza reporting was owned by the sister of David Grundy, Esq., who had been retained counsel for Defendant John MacIntyre who had been employed by Washoe County.

109.    During the litigation, Mr. Wiseman noticed that the transcripts were not correct.

110.    Mr. Wiseman did not know that Mr. Grundy's sister, Diane Brumley, was the Court Reporter. She was literally protected by the State of Nevada Attorney General's Office from prosecution for preparing false transcripts.

111.    Eventually Mr. Wiseman learned that Mr. Grundy's sister had done the court reporting which was missing over 100 pages of transcripts.

112.    The missing transcripts involved misconduct by certain judges within the Second Judicial District Court.

113.    As a result of the misstated transcripts, a summary judgment was granted.

114.    Currently pending on appeal to the Nevada Supreme Court are claims that

were not granted summary judgment in the federal action.

115.   Although Mr. Wiseman has requested discipline against Mr. Grundy and his sister, the Nevada State Bar has refused to pursue action against him.

116.   Neither has any action been brought against Mr. Grundy's sister.

117. Because Mr. Mirch insisted upon investigation as to why the transcripts were altered, the State of Nevada Northern Nevada Disciplinary Panel initiated a scheme to cause Mr. Mirch to be disciplined without proper cause.

### USI  v. Frank/APPI

118.   Kevin J. Mirch, Esq.,  represented Dr. Frank and APPI in an action entitled *Universal Sales v.  APPI, Frank*, et. al.,  CV-N-91-0375-ECR (VPC).

119.   On or about January 9, 1992, Kenneth Frank individually, and on behalf of APP,  entered into a contract with Kevin Mirch for legal services. Pursuant to the terms and conditions of his agreement with Dr. Frank and APPI, Mr. Mirch was entitled to 40% of any amounts collected on the judgment plus $25 per hour.

120.   The $25.00 per hour was charged because the Franks had already been sued and Mr. Mirch filed a Counter Claim.

121.   Dr. Frank had been sued by Mr. and Mrs. Martin Brooks and Universal Sales, Incorporated.   Dr. Frank counter claimed the Brooks and USI.

122.  Dr.  Frank and APPI were willing to walk away from the action without any award, just as long as they would not be civilly liable for damages.

123.   After several years of litigation against highly competent counsel, on or about March 20, 1995, the Federal District Court entered an order awarding $3,439,868.00 to Kenneth Frank, Stephen Cherniske and his related entity Advanced Physicians' Products.

124.   Mr. Mirch was entitled to 40% of these funds.

### Frank/APPI efforts to collect USI judgment

125.  Dr. Frank, Judy Frank, and APPI  fraudulently attempted to collect the

amounts due from Universal Sales.  The attempt was made without the knowledge or permission of Mr. Mirch.

126.  During 1995, McDonald Carano and Jeffrey Dickerson were retained by Dr. Frank or his related entities and individuals to find the Brooks/USI assets.

127.  Mr. Mirch was not aware that other counsel had been hired by Dr. Frank from 1995 until after 2000.

128.  After 2000, Mr. Mirch learned that McDonald Carano had used, nearly exclusively, Billy Savage a private investigator.  Mr. Savage's ex-wife has admitted that Mr. Savage regularly broke into houses and businesses to obtain evidence or contracts in order get his clients out of having to pay amounts owed.

129.  Mary Savage informed Mr. Mirch in November of 2005, that Mr. Savage had represented McDonald Carano and provided copies of billing statements showing the relationship that existed between the Savage Investigative Firm and the McDonald Law Firm.

130.  Not only did Pat Lundvall, Esq., use the Savage firm, but many members of her firm used his services.

131.  Not only did Ms. Lundvall have a business relationship, as divorce attorney,  with Mr. Savage, but they shared a social relationship for several years.

132. Ms. Lundvall's relationship was so close that she represented Mr. Savage in his divorce against Mrs. Savage.

133.  That divorce consisted of many questionable decisions because the presiding judge had been a previous partner in McDonald Carano and should have recused herself from the proceedings.

134.  Upon information and belief, Mr. Savage was retained by either Dr. Frank and/or the McDonald Law firm to break into Mr. Mirch's office and obtain contracts he had with Dr. Frank for professional services rendered by Mirch & Mirch for over 5 years of services and resulting in millions of dollars of relief.

135.  The McDonald firm lied that the Brooks/USI had no assets, when in 1995 they had discovered the assets, their location, but none the less, told Judge Hardesty that Mr. Mirch had manufactured the fact that they knew about the location of assets.

136.  These statements were false as in 1995 Mr. Savage had located millions of dollars of assets in the United States, Canada, the Cayman Islands and many other locations.

137.  Dr. Frank chose not to hire Mr. Savage and instead entered into an agreement to pay Mr. Emanuel Kopstein, who obtained the assets through use of his own legal connections to hire counsel.

138.  Dr. Frank, Judy Frank, and APPI fraudulently attempted to collect the amounts due from Universal Sales without the knowledge of Mr. Mirch.  The attempt was made without the knowledge or permission of Mr. Mirch.

139.  Following location of the Universal/Brooks assets, Dr. Frank, Judy Frank, and APPI attempted to collect funds without Mr. Mirch's knowledge and consent from Universal Sales/Brooks.

140.  Mr. Mirch was informed by Nate Jenkins, Esq., that Dr. Frank and APPI were attempting to collect funds from Universal Sales/Brooks without Mr. Mirch's knowledge.  Mr. Jenkins represented Mr. & Mrs. Brooks and Universal Sales.

141.  Mr. Mirch contacted Dr. Frank who refused to acknowledge Mr. Mirch's right to 40% plus $25 per hour under his contingency contract.

142.  Since Dr. Frank had caused Mr. Mirch's office to be burglared for the contracts proving amounts owned to the Mirch's firm, he retained the McDonald firm and refused to make any payments. This occurred despite the fact that settlement agreements had been reached between Mr. Mirch and the Franks based upon Mr. Mirch requiring surgery.  A second settlement was reached because it was admitted that Judge Hardesty was wrong in his order.  In that settlement, the agreement required disclosure with Judge Hardesty regarding his mistake.

22

143.   Ms. Lundvall, Esq., accepted the collection task which was underneath their normal type of business, but because she was desperate for funds, she agreed to a lucrative agreement to defend  Mr. Mirch's attempt to obtain over $1.4 million dollars due to him.

144.   The Franks retained a private investigator to find the Brooks assets and then misrepresented to Mr. Mirch that there were no assets.

145.   The Franks had hired Mr. Savage as the private investigator.

146.   While claiming that the Defendants had no assets, Mr. Savage had found over several million dollars of assets in the Cayman Islands, Nevada, and Canada.

147.   Mr. Mirch believed that there were no assets based upon the false statements of Dr. Frank.

148.   Mr. Savage the private investigator was a client of McDonald Carano Wilson.

149.   McDonald Carano Wilson was aware of the funds owed to Mr. Mirch and the assets that had been found by Mr. Savage because they represented Mr. Savage in his divorce from Mrs. Savage.

150.   Mrs. Savage claimed an interest in the contingent interest in the funds found for the Franks.

151.   On or about September 23, 1999, without the permission of Mr. Mirch, Dr. Frank and APP fraudulently assigned the proceeds from the action to RC International, LTD, a sole proprietorship of Cary Gatenby and Emanuel Kopstein.  Dr. Frank assigned the proceeds in order to hide from Mr. Mirch the fact that over $1,800,000 had been located in a bank in Canada.

152.   The McDonald Carano Law firm was aware of the money due to Mr. Mirch with exceeded with interest $2,000,000.00.

153.   Eventually Mr. Mirch learned about the missing assets from the Plaintiffs in the underlying action.

23

154.   Mr. Mirch advised McDonald Carano that the monies would have to be returned to the Bankruptcy Court in Santa Barbara, California.

155.   When Mr. Mirch advised McDonald Carano employees that funds had to be returned, he was informed that if he disclosed the same he would be attacked by the Nevada Bar Association, sued, disbarred, and would win because they controlled the Court.  The Court in this case was Judge Hardesty.

156.   Realizing his obligation to disclose in accordance with the Court's order, Mr. Mirch made a disclosure to a Bankruptcy internal affairs entity controlled by the government. After which, Hardesty took over control of the Judge Adams case, prepared with Laxalt and others individuals intent upon destroying Mr. Mirch's business.

### Mirch v. Frank

157.   Mr. Mirch initiated an action against Dr. Frank, Mrs. Frank, and APPI to collect monies due under the contract, Mirch v. Judy Frank, Kenneth Frank, and APPI, CV-N-01-0443-ECR-RAM.

158.   Eventually, Kent Robison became counsel for Dr. Frank, Mrs. Frank, and APPI.  Mr. Robison admitted on several occasions to Mr. Mirch that  his clients (Franks/APPI) were wrong in the position they took and sought a settlement to resolve the matter.

159.   During negotiations of a dispute between Kevin J. Mirch,  Dr. Frank, Judy Frank and APPI, Kent Robison informed Mr. Mirch that there was only $1,000,000 in available assets to pay Mr. Mirch's legal services bill.

160.   Mr. Mirch relied upon Mr. Robison's statement that only $1,000,000 was available for payment of all claims.

161.   On or about April 17, 2003, Kent Robison agreed in writing to the unconditional settlement of all claims between Advanced Physicians Products, Inc., Kenneth Frank, and Judy Frank.  The letter confirmed an oral offer made  by Mr.

Mirch to settle. Under the terms of the settlement Mr. Mirch would be paid $300,000. Mr. Mirch only agreed to $300,000.00 because he believed that only $1,000,000.00 was available.  In reality, over $4,000,000.00 was available.

162.   Following the settlement, Dr. Frank, Judy Frank, and APPI refused to pay the $300,000 due in accordance with the settlement.

163.   In order to avoid paying, Mr. Robison  intentionally caused the litigation to proceed and actually interfered with the settlement he negotiated.

164.   When Mr. Mirch would not refuse to give up his fee, the McDonald Firm used the Nevada State Bar- Northern Nevada Discipline Panel as a litigation tool to improperly charge Mr. Mirch for filing a complaint after being threatened with disbarment if he disclosed to the Santa Barbara Bankruptcy Court the Brooks/USI funds.

### Mirch v. McDonald

165.   Mr. Mirch sued McDonald Carano for the threat that was made against him in the Second Judicial District Court.

166.   The case of Mirch v. McDonald was originally assigned to the Honorable Brent Adams.

167.   The McDonald Defendants retained Bruce Laxalt, Esq. who filed a motion to dismiss the action against McDonald Carano.

168.   Days before the hearing on the motion to dismiss before Judge Adams, Judge Hardesty re-assigned the case to himself.

169.   During the hearing before Judge Hardesty on the motion to dismiss, Judge Hardesty, without prior notice to Mr. Mirch, converted the motion to dismiss into a motion for summary judgment.

170.   On or about October 9, 2003, Judge Hardesty issued a scathing order against Mr. Mirch granting summary judgment and imposing severe sanctions against Mr. Mirch including a referral to the Nevada State Bar.

25

171.  Judge Hardesty, without any evidence to support his order, claimed that Mr. Mirch had sued McDonald Carano to force their disqualification.

172.  Upon information and belief, Ms. Lundvall disqualified herself because she knew since 1995 the location of the Brooks/USI assets;   had a personal relationship with the material witness that had located the Brooks/USI assets; and had a financial problem due to a poor restaurant investment which required her making the money owed to Mr. Mirch (or a portion of the money owed to Mr. Mirch).

173.   Following the settlement, Dr. Frank, Judy Frank, and APPI refused to pay the $300,000 due in accordance with the terms of the settlement.

174.  Upon information and belief, Pat Lundvall refused to release funds agreed to be paid to Mr. Mirch, who was facing a second trial at that time, because she needed the funds for her failing restaurant.

175.  Upon information and belief, Ms. Lundvall's financial condition was so severe that she had borrowed substantial funds from Judge Munnell, a mediator in the Nevada Supreme Court Mediation program.  This created an irreparable conflict of interest.

176.  Because Lundvall misrepresented facts to Judge Hardesty, Mr. Mirch was subjected to severe sanctions, defamation, lost a substantial amount of business, and his physical condition worsened.

177.   Ms. Lundvall also misrepresented to Judge Hardesty that Bankruptcy law required the Brooks/USI funds to be paid over to Dr. Frank as part of a new bankruptcy filed in Reno.  Ms. Lundvall, by and through her counsel Bruce Laxalt, made this statement even though they knew that another federal bankruptcy judge had issued an order requiring the return of all of Frank's assets (including the Brooks/USI chose in action), while knowing about the other order and that it had not been appealed, thus making it final.

178.  Judge Hardesty claimed that the Bankruptcy Judge's order did not have

to be recognized because it did not follow applicable law.

179.   Judge Hardesty failed to recognize that the Bankruptcy Order was not appealed and became final.

180.   Judge Hardesty ignored the order because he was seeking a position on the Nevada Supreme Court and needed the political power of a law firm known as McDonald Carano Wilson and Bergin.

## Conflicts relating to Judge Hardesty

181.   Judge Hardesty accepted substantial political contributions from McDonald Carano Wilson and Bergin and participated in a number of meetings during which his candidacy was discussed.

182.   At the same time, Judge Hardesty had acted as Chief Judge for the Second Judicial District Court.  During that time Mr. Mirch had complained about a number of matters that Judge Hardesty refused to resolve:

a.   Transcripts being altered in at least 2 cases.

b.   Judges met with counsel outside the presence or position of other counsel.

c.   Files were missing from the Courthouse because Judge Hardesty would not allow the duly elected clerk of the court to do her job (i.e., monitor the files to make sure that files were not altered).

d.   Money collected in certain court rooms was missing and required an audit.  Judge Hardesty refused to audit those records in order to prevent a public scandal.

e.   Judge Hardesty was aware that one file relating to a judge's malpractice prior to becoming a judge was retained exclusively in that judge's chambers in order to prevent others from reviewing that file.

f.   Certain judges improperly discussed cases with one another. In particular, Judge Hardesty discussed the Mirch/McDonald case with

Judge Whitehead. Judge Hardesty also discussed the Wiseman case with Mr. Wiseman in an attempt to convince him to drop the case. Mr. Mirch was not present when that ex parte conversation occurred.

g.    Judge Hardesty threatened Barney Ng, owner of Wild Game Ng, LLC, stating that if he did not settle a case he would suffered substantial sanctions imposed by him or caused to be imposed by him.  Judge Hardesty had been recommended to serve as his mediator by Anne Morgan, IGT counsel's sister (Sarah Beth Brown). Anne Morgan is married to Defendant Beesley who is an outside attorney for IGT.

h.    Judge Hardesty was aware of the fact that Judge Kosach was selling baseball cards on the side for parties and receiving a 10% commission for the same.  Judge Kosach failed to disclose the same or instruct Judge Kosach not to do the same.

I.    Judge Hardesty received contributions without advising other counsel having business before the court.  Mr. Mirch would have recused Judge Hardesty had they known that he had a direct interest in the other firms. Judge Hardesty had a duty to disclose and recuse himself as Mr. Mirch was also running for the Supreme Court.

183.    Judge Hardesty had conversations with these individuals illegally in violation of a number of judicial cannons of ethics.

184.    Again, Judge Hardesty used his clout to cause cases not to be tried in an effort to protect certain "preferred counsel" and companies that were paying substantial contributions to his campaign without disclosing the same to Mr. Mirch.

**Hardesty protecting Laxalt and IGT**

185.    Judge Hardesty referred the Mirch v. McDonald Carano matter to the State Bar of Nevada in order to protect large law firms,  IGT and other entities and individuals that were subsidizing his campaign.  Judge Hardesty did not disclose to

Mr. Mirch that he had these conflicts before refusing to hear Mr. Mirch's motion to reconsider his scathing order of October 9, 2003.

186.    Judge Hardesty did not require Bruce Laxalt, who represented McDonald Carano to respond to a motion to reconsider filed by Mr. Mirch after Judge Hardesty's improper order had been filed.

187.    Judge Hardesty's Order denying Mr. Mirch's motion to reconsider was within days of a fund raising party held at the home of Pat Lundvall, a partner in the law firm of McDonald Carano which was a defendant tin the underlying action.

188.    Bruce Laxalt was represented lawyer Sarah Beth Brown.

189.    Sarah Beth Brown represented IGT and Acres at varying times.

190.    Sarah Beth Brown's sister is Ann Morgan, Esq.

191.    Ann Morgan, Esq., is a partner at Jones Vargas

192.    Jones Vargas represented Wild Gaming Ng, LLC in an action against Acres Gaming, Inc.

193.    Ann Morgan, Esq., is and has at all times relevant hereto been married to Bruce Beesley who had previously initiated false claims with the Nevada State Bar against Mr. Mirch when he successfully sued IGT.

194.    Rob Bare is aware that Bruce Beesley, Bridget Robb Peck, and Bruce Laxalt use the disciplinary process to obstruct justice in cases that they cannot otherwise control by other legal means.

195.    Acres Gaming, Inc. is a wholly owned subsidiary of International Gaming Technology which also owns IGT.

196.    Judge Hardesty acted as a mediator in the Acres v. Ng action.

197.    Judge Hardesty had a duty to disclose to Mr. Ng that IGT was covertly using attorneys with direct relationships to IGT  as Siena's attorney but failed to do so in order to protect his preferred counsel, businesses, and because he was raising funds for his run as a Nevada Supreme Court Justice.

198.   Mr. Mirch eventually substituted in as counsel for Wild Game Ng, LLC in the Acres and IGT actions.

199.   The substitution occurred when Mr. NG became dissatisfied that Jones Vargas was not pursing ACRES Gaming diligently.  Later, Mr. Ng learned that Jones Vargas and his own personal counsel there was Anne Morgan, married to Bruce Beesley, Esq., and sister to IGT house counsel Sarah Beth Morgan.

200.   Following Judge Hardesty's acting as a mediator in the Acres v. Wild Game Ng suit, he received substantial contributions from IGT.

201.   On or about the same time, Mr. Mirch was also running for the Nevada Supreme Court.

202.   Mr. Mirch refused any political contributions.

203.   Judge Hardesty had a duty to disclose his contributions from the McDonald Carano Defendants, IGT, and the relationship between Jones & Vargas Ann Morgan/and Bruce Beesley.  Instead, he participated in a scheme to destroy Mr. Mirch's career by threatening a false action against him in order to prevent him from litigating against IGT and other constituents that had lost to Mr. Mirch repeatedly over the years.

204.   Upon information and belief, prior to Judge Hardesty filing his false order against Mr. Mirch, copies of the proposed order were provided to various individuals including but not limited to Bruce Laxalt, Bruce Beesley, Jones Vargas and Dana Moore (counsel for Wells Fargo in Diamond Motors v. Wells Fargo, Second Judicial District Court, State of Nevada, County of Washoe), Randall Jones (counsel for the Paris Casino, Caesars in Mattes v. Paris, Second Judicial District Court, State of Nevada, Washoe County); Jennifer Walt, Littler Mendelson, Bourdeau v. Bank of America, Second Judicial District Court, State of Nevada, County of Washoe. Judge Hardesty improperly transferred his order to a number of adversary attorneys in cases in which Mr. Mirch served as opposing counsel.

205.    The order was faxed in order to cause embarrassment to Mr. Mirch, Mirch & Mirch, and to prevent him from pursuing successful legal actions against large entities operating within the State of Nevada (e.g., IGT, Bank of America, Wells Fargo, Hospital Corporation of America).

## Protecting IGT and Casino Constituents

206.    IGT suffered from a number of legal problems including defective equipment, sales of used equipment as new, defective software, and selling software that was not licensed.

207.    Mirch learned that IGT was removing serial numbers from defective gaming equipment in order to prevent other regulators from other jurisdictions from learning about the defects.

208.    When Mirch refused to prevent the disclosure of the defective equipment and software, the Defendants devised a scheme to cause Mr. Mirch from continuing as counsel from Siena by falsifying accusations of State Bar violations.  The scheme followed that which had been used previously when Mr. Mirch sued IGT for selling used equipment as new to the Gold Club Casino.

209.    Upon information and belief, Senator Harry Reid was aware of the illegal use of obstructing legitimate cases in order to protect his constituents.

210.    Prior to arranging a hearing, the State Bar of Nevada through Rob Bare, its general counsel, had admitted that Justice Hardesty's order lacked merit.

211.    Rob Bare attended a meeting in 2003 with Mr. Mirch and David Hamilton.  During that meeting he admitted that Justice Hardesty's order lacked merit for a disciplinary action against Mr. Mirch. At that time, Mr. Bare shelved that complaint.

212.    Only after a trial became imminent between IGT and Siena over defective equipment and other software (i.e., January 2006) did the State Bar's Disciplinary Board decide to pursue a frivolous action against Mr. Mirch.

213.   In March 2005, ACRES Gaming lost a verdict to Siena for an amount in excess of $1,700,000.00.  With principle, interest, fees and costs, the award exceeded $2,400,000.00.

214.   In documents filed with the Security Exchange Commission, International Game Technology agreed to pay amounts due in the ACRES matter because ACRES merged with IGT or a related entity. Despite having control over ACRES, IGT failed to license many of its ACRES products.

215.   IGT employees have made comments that it has control over certain members of the judiciary that will protect it from further verdicts.

### Judge Kosach/Baseball Card Fraud/ Refusal to Provide Transcripts to Mr. Mirch

216.   During the late 1990's Mr. Mirch noticed a number of questionable orders originating from Judge Kosach following an incident wherein one of his clients, John Brignand refused to allow Judge Kosach to have a rare baseball card.

217.   During a meeting in Judge Kosach's chambers, Judge Kosach learned that Mr. Brignand had collected rare base ball cards.  Judge Kosach insisted that Mr. Brignand allow him to sell the card and take a commission for the same.

218.   Upon information and belief, the commission was 10%.

219.   Mr. Brignand refused.

220.   Judge Kosach suggested that he reconsider before he sign an order that had not been contested and would allow Mr. Brignand judgment by default.

221.   Mr. Mirch told Judge Kosach that his conduct was improper and refused, on behalf of Mr. Brignand, to allow him to sell any cards.

222.   Following that incident Judge Kosach issued a number of improper orders and openly made derogatory comments about Mr. Mirch.

223.   Judge Hardesty was aware of the animosity that existed between Judge Kosach and Mr. Mirch, but refused to discuss the conflict with Judge Kosach. Instead

32

he allowed improper opinions to be entered.

224.   Judge Kosach's comments were unfair as they falsely attacked Mr. Mirch's success.

225.   Judge Kosach prior to being elected a judge had little or no trial experience.

226.   On one occasion, Mr. Mirch learned that Judge Kosach was making derogatory comments about Mr. Mirch, the Wiseman Case, and other matters. Judge Hardesty was aware of this improper conduct, the ex parte communications between Judge Kosach and others, but failed to take appropriate steps to correct this improper and illegal conduct.

227.   When Mr. Mirch learned about the same, he contacted his counsel David Hamilton.

228.   David Hamilton and Mr. Mirch had a meeting at Judge Kosach's chambers to discuss the matter.

229.   The meeting was transcribed.

230.   In that meeting, Judge Kosach admitted making derogatory comments to attorneys regarding Mr. Mirch, Mr. Wiseman, and veterans in the Reno area.

231.   The transcribed comments contained admissions that Mr. Mirch and his clients were being discriminated against in litigation before his Court.

232.   Following the meeting, Mr. Mirch requested the transcript (tape and paper).

233.   Mr. Mirch was outright denied access to the tape and transcript.

234.   Judge Kosach's discussion of Mr. Mirch with other attorneys and judges is grounds for permanent removal from the bench and disbarment as an attorney.

235.    When Mr. Mirch insisted upon the transcript the Nevada State Bar Association - Northern Nevada Disciplinary Panel, intensified its attempt to set a date to hear his matter involving Judge Hardesty's Order.

236. Judge Hardesty as the presiding judge had a duty to require Judge Kosach to provide the transcript, but instead refused to make Judge Kosach provide the records that not only exonerated Mr. Mirch from any wrongdoing, but also to prove that his constituents were being illegally protected (e.g., IGT, Bank of America, HCA, and certain preferred attorneys Laxalt, Sarah Beth Brown).

237. Judge Hardesty also had a duty to disclose wrongdoing by a judge to the Judicial Review Board or Committee. Instead, he protected Judge Kosach from his obvious wrongdoing.

238. Judge Hardesty also had a duty as it proved that the Wiseman case was being openly discussed within the Second Judicial District Court in an attempt to protect missing money from certain Courts. Specifically, Mr. Wiseman had discovered that money was missing from Judge Agosti's Court prior being constructively terminated from his position with the County. Instead of insisting upon an audit, as requested by Mr. Mirch, Mr. Mirch was maligned and the State Bar was asked by Judge Hardesty to investigate Mr. Mirch. Mr. Mirch was a whistleblower and had a duty to make the disclosure and was protected by law from retaliation.

239. Judge Hardesty refused to follow both state and federal whistle blower statutes.

240. Mr. Mirch requested that Judge Hardesty take the appropriate action against Judge Kosach as a whistle blower. Instead of recognizing protection afforded whistle blowers, Mr. Mirch was openly punished by Judge Hardesty's false order.

**Hardesty's Attack Upon Dr. Kenneth Clark**

241. Judge Hardesty regularly uses his power with boards to ruin or cause serious harm to whistleblowers.

242. Judge Hardesty told Dr. Kenneth Clark that he could no longer appear in his court after he discovered that children and adults were being molested at Truckee Meadows Hospital. Truckee Meadows Hospital was owned by Hospital Corporation

of America and contributed substantially to the Second Judicial District Court. When Dr. Clark disclosed that a certain physician was molesting children and adults, he became concerned that he would be implicated in his involvement in the sexual misconduct and accordingly went on a spree to destroy Dr. Clark's career. At the time, Dr. Clark was over 80 years old and had fought a battle against HCA for over 15 years. HCA was eventually fined nationally over one billion dollars for medicare and medicaid fraud. Dr. Clark was a hero being wrongly attacked to cause emotional, physical and professional harm.

243.   Judge Hardesty had a duty to disclose the referrals that had been made to Truckee Meadows Hospital, to order that the patients that were exposed to harm were properly cared for, and that damages were paid by the County as Dr. Clark had disclosed the wrongdoing which Judge Hardesty ignored. Judge Hardesty refused to make the appropriate decision be cause HCA and its related entities were had substantial clout within the Reno area and nationally. Senator Frist's family is the majority shareholder in HCA. Instead, the improper referrals were protected.

244.   At least one case was improperly decided as a result of Judge Hardesty's refusal to disclose the improper referrals (Suter v. HCA, Second Judicial District Court State of Nevada, Washoe County).

245.   Mr. Mirch represented Dr. Clark in an action against Hospital Corporation of America.

246.   Following Dr. Clark's success against HCA, Judge Hardesty told attorneys openly in court to sue Mr. Mirch. Judge Hardesty obviously had a conflict against Mr. Mirch, but failed to recuse himself from cases involving Mr. Mirch, even when he was telling other attorneys to sue Mr. Mirch.

## Missing Files from the Washoe County Clerks Department

247.   The Washoe County Clerk is an elected position.

248.   The current Washoe County Clerks name is Amy Harvey.

249.   Once elected Amy Harvey learned that the Courts (Judges) controlled the files.

250.   Ms. Harvey initiated an action against Washoe County in which she was not successful.

251.   This meant that the Judges controlled the court files.

252.   This also meant there was little or no protection over the files.

253.   The Citizens of Washoe County were not aware that Ms. Harvey's position had been relegated to nothing more than a clerk.

254.   Ms. Harvey learned that Judge Hardesty had spearheaded to litigation which provided complete control to the judiciary instead of the Clerk of the Court.

255.   Ms. Harvey learned that the reason that the judiciary controlled the files was that many were altered in order to protect constituents of certain judges.

256.   On at least one occasion the files were missing.

257.   When Ms. Harvey questioned about the existence of the file she was improperly reprimanded and denigrated amongst her fellow workers by Judge Hardesty.

258.   The filed described above involved malpractice by a judge prior to the time that he or she had been seated.

259.   When Mr. Mirch learned that files were missing he complained about the same. Once again, a State Bar Complaint was threatened if Mr. Mirch continued to pursue the action.

## FIRST CLAIM FOR RELIEF

### (COMBINATION AND CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT)

### (All Defendants)

260.   Plaintiff incorporates by reference all claims of this complaint as if more fully set forth herein.

36

261.   Beginning at least as early as November 1985, the exact date being unknown to Kevin J. Mirch, and continuing thereafter up to and including the date of the filing of this Complaint, the Defendants have conspired to inhibit trade and competition in violation of §1 of the Sherman Act, 15 U.S.C. 1, by engaging in an unlawful combination and conspiracy to blacklist, use the State Bar of Nevada as a Business Tool to cause harm to Mr. Mirch's business; and cause a boycott of Mr. Mirch's business by terminating repeatedly causing false claims to be filed with the State Bar of Nevada Disciplinary Board, changing the terms and conditions of disciplinary action imposed or to be imposed against Mr. Mirch, thus violating due process afforded Kevin J. Mirch, Esq., by the State Bar of Nevada and Nevada Supreme Court's own rules and regulations.

262.   The Defendants have agreed to prevent the disciplinary process to be used as a business or fraudulent tool to cause "non-compliant" attorneys that participate in illegal or improper conduct which directly affects interstate commerce. "Non-compliant" attorneys and members of the judiciary are those individuals willing to participate in the illegal conduct.

263.   Kevin J. Mirch and Mirch & Mirch have suffered the type of injury that the anti-trust laws were intended to prevent and that flows from that which makes the Defendants' acts unlawful. The injury reflects the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation.

264.   Kevin J. Mirch, Esq. and Mirch & Mirch's professional, social, economic, and emotional injury and damages coincide with the public detriment tending to result from the violation anti-trust laws. The effect of the conspiracy is a diminution in competition in the field of law, gaming regulation and law. This is particularly true in light of the fact that the State Bar of Nevada has imposed rules and regulations that it refuses to follow with respect to Kevin J. Mirch and Mirch & Mirch solely because he has successfully protected his clients, uncovered illegal conduct

1  inherent in the manufacturing of gaming devises, and software, and relied upon

2  contracts entered into with the State Bar of Nevada that are designed to protect his

3  interest and that of his clients.

4      265.   In addition, the unlawful attacks upon Kevin J. Mirch, Esq.,'s business

5  and privileges will impose a black mark on Kevin J. Mirch's and Mirch & Mirch's

6  career, which is disclosed in regularly published legal journals, and similar other

7  matters. The result will be that Mr. Mirch will be unable to practice or serve as a judge

8  or in many other positions that are readily available to honest hardworking attorneys.

9      266.   The State Bar of Nevada's Disciplinary Board has caused this damage to

10 Mr. Mirch  as a result of false and malicious State Bar Disciplinary actions designed

11 to protect "preferred" attorneys and their clients from legitimate causes of action. The

12 competitive significance of Kevin J. Mirch's  exclusion from the State Bar of Nevada

13 or hinderence by repeated false claims must be measured, not just by the particularized

14 evaluation of his own practice, but also by a general evaluation of the impact of the

15 restraint on other participants and potential clients who suffer due to illegal conduct

16 allowed to perpetuate by certain "preferred attorneys" such has Bruce Laxalt, Bruce

17 Beesley, Sarah Beth Brown, Ann Morgan, and others who illegally participate in the

18 hindering legitimate claims. As a result, the gaming industry in the State of Nevada

19 is at risk and may fail because of fraud be perpetuated upon customers.

20     267.   Soon after,  Kevin J. Mirch was targeted for termination of his license by

21 Judge Hardesty and his preferred attorneys, and previous clients; a false order was

22 issued  in violation of another order issued by a Bankruptcy Judge and which had not

23 been appealed and was ignored by Judge Hardesty; and Mr. Mirch was horrifically

24 attacked in order to undermine his business and monies due to individuals, entities,

25 pensions and profit sharing plans, solely to cause Dr. Kenneth Frank and his counsel

26 to abscond with literally millions of dollars that had previously been ordered to be

27 delivered to the Santa Barbara Bankruptcy Court.  Because Mr. Mirch chose to follow

28

the Bankruptcy Court's order that had not been appealed, he has been subjected to 2 years of disciplinary action without a hearing being held and in direct contravention of his medical care.

268.   At one point in time prior to Defendant's constructive attempt to terminate Mr. Mirch's license, Mr. Mirch had been called to testify in Santa Barbara about the Bankruptcy Court's Order.   Mr. Mirch was told that if he testified or disclosed that the money should be repaid to individuals from which it had been stolen that he would lose his license, be attacked by the State Bar and be subjected to relentless attacks by the state bar. All of these threats have occurred.   The threats occurred also when the State Bar was aware that Mr. Mirch was suffering from severe medical problems.    Because Mr. Mirch agreed to testify "honestly", the State Bar Disciplinary Board, certain "preferred attorneys", and Rob Bare   retaliated by constantly attacking Mr. Mirch's practice.  On one occasion Mr. Mirch was attacked for allegedly signing a false affidavit that he did not sign, was correct, and that he had no knowledge off.  Rob Bare was aware of this improper attack upon Mr. Mirch and refused to correct the same.   Instead, he feared for his own job and accordingly, participated in conduct that he knew was illegal.

269.   The State Bar of Nevada,  related entities and individuals have intentionally caused, by their conduct, a boycott of Mr. Mirch's, and Mirch and Mirch's legal  practice by constructively terminating his privileges, publishing the constructive termination, and defaming his abilities to potential and current clients.

270.   The boycott of Kevin J. Mirch, and Mirch & Mirch  has had an obvious effect on interstate commerce.

271.   This conspiracy has affected a number of attorneys to believe false statements about Mr. Mirch despite several successful claims for relief that have benefitted the Reno area from theft in the gaming, banking, securities, medical, and sexual misconduct in hospitals.

272.    Upon information and belief, the attorneys who improperly participated in the illegal out of state conduct include, but are not limited to Bruce Laxalt, Bruce Beesely, Bridget Robb Peck, Ann Morgan, Sarah Beth Brown, among others.   If the conspiracy is allowed to continue, it reasonable to assume that the damages sustained as a result of the same will not only continue, but increase.  Furthermore, the improper protection of the casino industry by this misconduct will thus cause Nevada's gaming industry to decline to a point that it has not credibility other than professional wrestling.

273.    Under § 1 of the Sherman Act the Defendants have established a number of illegal agreements, that have a direct impact upon interstate commerce via the conduct of their clients in conjunction with their own illegal treatment.   A number of honest attorneys have moved out of the State of Nevada in thereby depriving themselves of practicing in that  state and depriving their clients of receiving the attorney of their choice.   Thus the conduct and agreements created by the Defendants have denied interstate commerce to clients.   These same agreements reasonably will impact the clients constitutional rights  if not stopped.

274.    In addition, because the conspiracy has  actually been successful,  Kevin J. Mirch and Mirch & Mirch has lost substantial business not only in California but constructively in  various other locations throughout the United States.

275.    The Defendants conspired with others to abuse the Nevada State Bar Disciplinary process by waiting over 2 years before initiating an action and only shortly before large actions against IGT and other politically powerful entities are ready for trial.

276.    Since the targeting and eventual constructive disciplinary attacks upon the Plaintiffs and continuing today, Kevin J. Mirch and Mirch & Mirch have  been restrained in their ability to make his high quality services readily and fully available to the local, out of Washoe County, and out of State of Nevada public;  therefore the

public need for business litigation focusing upon fraudulent conduct will not be met.

277.   Defendants have depleted the resources of Kevin J. Mirch, and Mirch & Mirch who, even where granted his due process rights privileges, and review requested, has expended the financial resources required to remain in business or to compete successfully in resisting or overcoming the Defendants' conspiracy.  The conspiracy intends to deplete the resources of Mr. Mirch in order to cause fraudulent business affairs to continue within the state of Nevada.

278.   Defendants have delayed the ultimate granting of due process rights, privileges, and review so as to damage severely Kevin J. Mirch's  ability to compete or remain in business. By delaying the procedures required in their own bylaws, Kevin J. Mirch's administrative procedures have been ongoing for over 2 years. State Bar Rules require matters to be resolved in 45 days.  As a result he has lost a substantial amount of his business and caused severe medical problems to persist for prolonged periods of time.

279. The effect of the combination and conspiracy has been and will be, among other  things, to prevent and restrain competition in the furnishing of business litigation focusing on fraudulent manufacture of gaming equipment, software, and the theft of money from businesses by bank and other entities.

280.   As a direct and proximate result of the aforesaid combination and conspiracy, Kevin J. Mirch has expended considerable sums of money which he would not otherwise have been required to spend due to the necessity of overcoming the illegal attempts by the Defendants to deny Kevin J. Mirch and Mirch & Mirch their right to a substantial number of clients their constitutional rights.

281.   As a result of the combination and conspiracy to restrain trade and competition by the Defendants, Kevin J. Mirch has been caused to suffer and will continue to suffer substantial damages to his reputation and practice, all to his detriment.

282.  The Defendants  concerted efforts to eliminate Kevin J. Mirch and Mirch & Mirch as a competitor constitutes a group boycott in violation of Section 1 of the Sherman Act. By eliminating Kevin J. Mirch and Mirch & Mirch as a competitor, the boycott successfully reduced competition for the Defendants' and other compliant attorneys.

283.  Kevin J. Mirch is unable at this time to state finally the amount of damages sustained to date and those to be sustained in the future by reason of the illegal acts of Defendants as set forth herein.  Kevin J. Mirch  would show that, but for the illegal combination and conspiracy of the Defendants as alleged herein, as of the date of the filing of this lawsuit, he has suffered damages in an amount in excess of $75,000,000. Kevin J. Mirch is further entitled to three times the damages determined to have been sustained, simple interest on actual damages as allowed by law, costs of suit and attorney's fees for the trial or hearing in this Court, an additional amount in the event an appeal is taken to the Court of Appeals, and an additional amount for an appeal to the United States  Supreme Court and a cost of retraining for Kevin J. Mirch on those procedures he has been denied since his constructive termination from the State Bar of Nevada.

284.  The Defendants conspired with one another to monopolize or attempt to monopolize the legal business in  violation of 15 U.S.C.A. §1 and 2. The Defendants have conspired to restrain competition and inhibit trade, including denial of competitive advantages or opportunities, in violation of 15 U.S.C. §15 and §26.

285.  The Defendants conspired with one another to perform false and malicious peer review against Kevin J. Mirch in order to cause the loss of his privileges to practice law.  They did so by using and performing reviews by persons who were unqualified and/or who were biased competitors and who were motivated by anti-competitive intent.

286.  These Defendants have published false and inaccurate written reviews,

biased testimony, and false reports, in many cases contrary to well-established legal principles including violation of rules, regulations, and policies, for the purpose of harming Kevin J. Mirch, Mirch & Mirch all in an effort to pursue their anti-competition goal of causing the loss of privileges and goal of causing each attorney to become an "compliant individual fearful of protecting his or her clients constitutional rights".

287.   Defendants have knowingly, willingly, and maliciously sought to destroy Kevin J. Mirch's, and Mirch & Mirch's reputation and legal practice in order to inhibit or restrain competition from Kevin J. Mirch, and Mirch & Mirch. This is a pattern of conduct which can be established by the testimony of other lawyers and competitors. Such conduct requires an award of exemplary damages, treble damages and attorneys fees against the defendants, in order to discourage such conduct in the future.

288.   Plaintiff has suffered damages in excess of $75,000, the exact amount of which will be determined at the time of trial.

289.   Plaintiff has been required to retain counsel and as a such is entitled to reasonable attorney fees and costs.

290.   Kevin J. Mirch is entitled to recover threefold the damages he sustained, and the cost of suit, including attorneys fees, pursuant to Section 4 of the Clayton Act. 15 U.S.C. §15 (1988). In addition pursuant to Section 16, Kevin J. Mirch seeks declaratory and injunctive relief as prayed for herein. IS U.S.C. §26(1988).

## SECOND CLAIM FOR RELIEF
### (CONSTITUTIONAL VIOLATION DUE PROCESS)

291.   Plaintiff incorporates by all the previous paragraphs as if more fully set forth herein.

292.   Defendants intentionally and improperly failed to provide due process to Kevin J. Mirch, Esq., in Disciplinary matters before the Nevada State Bar Association for the last 15 years. This was done to protect illegal conduct by "preferred attorneys"

and their clients. The illegal conduct included, but is not limited to falsifying transcripts, altering files, losing Court files, threatening attorneys if they pursued actions against "preferred attorneys or clients such as IGT". This conduct constituted obstruction of justice in violation of the Civil Rights of Mr. Mirch and his clients.

293.    Defendants intentionally failed to follow their own bylaws, rules, regulations and precedent established in Nevada and regarding the discipline of an attorney who is disclosing illegal conduct by other individuals.

294.    Plaintiff, Kevin J. Mirch, Esq., has been licensed for over 20 years. During that period of time he has represented cases which had a direct impact upon the well being of the general public.

295.    Plaintiff, Kevin J. Mirch, Esq., as a licensed attorney has a property right subject to review under Nevada and California Law.

296.    Plaintiff, Kevin J. Mirch, Esq., has a right under the Fifth and Fourteenth Amendments of the United States Constitution, the California Constitution, and the Nevada Constitution.

297.    Procedures have been established by the State Bar of Nevada for the discipline of attorneys. The rules and regulations are subject to equal protection under the United States and Nevada Constitutions.

298.    Over the last 20 years, the State of Nevada - Northern Nevada Disciplinary Panel has failed to follow procedure necessary to assure that Mr. Mirch is not denied due process.

299.    The following conduct has violated Mr. Mirch's due process rights on a continuous basis:

> a. Mr. Mirch has repeatedly been the subject of attacks by the State Bar Association whenever a case was pending or close to trial (i.e., IGT v. Nevada Gaming Ng, Inc.

> b. Mr. Mirch was denied an immediate hearing on matters that he was

accused of in order to wait for an opportune time to prosecute him.

c.  Mr. Mirch was denied a hearing for nearly 2 years, and after Rob Bare represented that Judge Hardesty had erred in his opinion which prompted this disciplinary action.

d.  Mr. Mirch was entitled to a hearing with 30 days, but instead has had to worry about practicing law with the possibility of have his license taken away.

e.  Mr. Mirch was entitled to a fair hearing pursuant to the established rules and regulations.  Instead, new rules were established which denied Mr. Mirch the right to peremptory rights of judges hearing his case.

f.  Mr. Mirch had a right to an unbiased review, both at the ad hoc and hearing stage.  This included a diligent review of the committee which was not biased. A Biased committee is one that does not include competitors or individuals who have an interest in any litigation involving Mr. Mirch.

g.  Mr. Christensen, Esq., who works for Reno City Attorney's office and had a conflict of interest which prevented his involvement in this case.

h.  Mr. Christensen was involved in the acceptance of contractors fees for homes in the amount of $1,000.00 per property. Mr. Mirch was involved in a dispute that requested an accounting of the $1,000.00.  Because that money could not be found, a bond was issued which paid for the missing funds.  Mr. Christensen has a conflict since he is involved in the missing funds which caused a bond offering to be voted upon and eventually caused that money to be used to pay for the missing monies.

I.  Currently, before the Reno City Attorney's Office is a claim wherein Mr. Mirch represents Mr. Oberg in a dispute over an expansion at a Home Depot, that had previously been resolved, but the Defendants have

45

changed the terms by selling parts of the property without proper notice regarding the same.  Mr. Christensen's involvement in that matter makes his involvement in the Mirch Disciplinary matter  biased.   Mr. Christensen recognized this issue by writing a letter questioning the discrepancy.  Despite acknowledging the bias, Defendants have refused to remove competitors, previously used attorneys in an adversarial matter.

j. Mr. Mirch has been involved in public fraud which includes a number of attorneys who work in an adversarial relationship with Mr. Mirch.  For example, Mr. Mirch sued Washoe County for millions of dollars in missing money.   Mr. Mirch's office was bombed.  Washoe County refused to pursue the admitted wrongdoer. As such, attorneys currently working for the City Attorneys Office, the District Attorney's  Office, or the State of Nevada Attorney General's Office, each must be excluded. Each of these entities have direct conflicts with Mr. Mirch. The conflict exists because Mr. Mirch has openly disclosed illegal conduct involving each of these entities.  Despite these lawsuits, no steps were taken to avoid bias.

300.    Mr. Mirch's statute of limitations has run on Judge Hardesty's order.

301.    The State Bar had 2 years to bring a disciplinary action.  Instead, Mr. Bare admitted that Judge Hardesty was incorrect after reviewing Mr. Mirch's counsel's response.   Mr. Bare agreed not to pursue discipline after reviewing Mr. Hamilton's response.

302. Following the Wild Game Ng, Inc., v. Acres, Inc., verdict, and while knowing that a second claim existed and was set for trial in January of 2006, in order to protect, IGT and its counsel, a hearing was set in order to prevent Mr. Mirch from properly preparing for trial and in order to spread rumors that Mr. Mirch was going to

be disbarred.

303.   Mr. Mirch was specifically told that a decision to discipline him had already been made.  This rumor has been spread without reprieve and in an effort to impact Mr. Mirch's representation of Wild Gaming Ng before the January trial.

304. Mr. Mirch has been denied discovery including a transcript in which Judge Kosach admitted making derogatory comments regarding Mr. Mirch and one of his clients.  The conversation by Judge Kosach involved derogatory comments designed to cause Mr. Mirch direct and immediate harm.  The conversation is transcribed, but Judge Kosach has refused to provide the same. The transcript proves that Mr. Mirch was the subject of unfair treatment for the last 15-20 years from various sources.

305. Judge Hardesty was biased and had made statements to attorneys to sue Mr. Mirch.  This was done as Judge Hardesty was jealous that he had not passed the CPA test, but early in his career had regularly represented that he was a CPA. Judge Hardesty did this to create a practice. While Mr. Mirch was denied the right to state he was a CPA, Judge Hardesty could make such a statement even though it was not true.

306. Judge Hardesty improperly moved the case from Judge Adams to himself because he was running for Supreme Court and sought support from McDonald Carano.

307.   While Mr. Mirch was involved in 2 cases before Judge Hardesty (previously Judge Adams), Mirch v. Frank (state case), and Mirch v. McDonald Carano, he accepted cash funds and attended "like kind" meetings which substantial assets were paid to Judge Hardesty.

308.   While presiding in the Mirch v. McDonald and Mirch v. Frank cases, Judge Hardesty did not disclose that he was receiving funds from attorneys that had a direct, known, and absolute conflict of interest against Mr. Mirch. The following individuals made cash contributions or like kind ones without Mr. Mirch knowing that

Judge Hardesty was receiving money and like kind funds.

309.   Judge Hardesty's Campaign Contributions Report exposes the following:

1.     September 27, 2004 McDonald Carano Wilson contributed $2500;

2.     March 11, 2004 - John Frankovich (partner of McDonald Carano) $1000

3.     May 10, 2004 Laxalt & Nomura, counsel for Defendants $1000;

4.     May 10, 2004 McDonald Carano Wilson $1090;

5.     McDonald Carano Wilson June 10, 2004 $1500;

6.     March 11, 2004 Defendant Pat Lundvall hosted a dinner for a fundraiser for Judge Hardesty.

310.    These contributions were accepted and not revealed to Mr. Mirch as the opposing party was still very much active before Judge Hardesty.

311.   On March 9, 2004, days within contributions from Mr. Frankovich, McDonald Carano, Laxalt and Nomura and a dinner at Ms. Lundvall's house, Judge Hardesty entered an Order Denying Plaintiff's Motion for Reconsideration, as well as an order re: sanctions.

312.   Canon 4 permits a judge from accepting a gift or donation only if the donor is not a party or any other person who has come or likely to some or whose interests have come or are likely to come before the judge". Canon 4(D)(5)(h).

313.   Canon 5(a)((3) provides that a candidate for judicial office (a)" shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary...".   Judge Hardesty had a duty to disclose that he was meeting with opposing counsel and receiving money from opposing counsel.

314.  Judge Hardesty should have disclosed the contributions by the Defendants and their attorneys to the Plaintiff.

315.   Judge Hardesty apparently attended a fund raiser at the Defendant Pat

Lundvall's home just two days after ruling on Plaintiff's Motion to Reconsider and entering and order re: sanctions in the case of Mirch v. McDonald.

316.   Because Judge Hardesty took the cases from Judge Adams and changed the motion to dismiss to one for summary judgment, his conduct created the appearance of impropriety sufficient to show a violation of Mr. Mirch's Due Process.

317.   This conduct at least gives the impression of impropriety violation of Mr. Mirch's right to due process and a fair, unbiased forum.

318.   The procedures were not followed in the proposed hearing set for disciplinary action against Mr. Mirch.

319.   Mr. Mirch has not been given sufficient time to respond to Mr. Kennedy as he has not been made available.

320.   Defendants have failed to follow the procedures normally set for a hearing.

321.   Instead of following the procedures established for a hearing, it is necessary to provide proper notice of a hearing and a time to prepare.

322.   Upon information and belief, Mr. Bare has secretly provided information to the Panel assembled without the permission of Mr. Mirch.  The documents are secretly provided so that Mr. Mirch is unable to cross examine the evidence.

323.   The time to file a hearing before Mr. Mirch has run well before the 2 years has lapsed.

324.   2 years lapsed because Mr. Bare agreed with Mr. Hamilton that Judge Hardesty's Order lacked merit.

325.   Mr.  Kennedy was hired by the State of Nevada Bar - Northern Nevada Disciplinary.

326.   Mr. Kennedy agreed with the order entered by Judge Hardesty without requesting any evidence from Mr. Mirch.

327.   Mr. Kennedy works for Lionel Sawyer Collins as a partner.

328.   Lionel Sawyer Collins is adversary counsel for IGT in Wild Game NG v. IGT.

329.   The Nevada State Bar Association- Northern Nevada Panel has taken a position in favor of IGT at the expense of Mr. Mirch and only to avoid trial in January against IGT.

330.   Defendants had a duty to provide to Mr. Mirch a separate notice of the accusations and a reasonable opportunity to respond to them.

331.   Mr. Mirch  was not provided with proper  notice of specific violations resulting in the loss of his privileges.  Only general statements agreeing with Judge Hardesty have been provided.

332.   In fact, Defendants charges were fabricated after the initial administrative proceedings were initiated.

333.   Defendants have an obligation to provide a notice of the individuals present, transcript of the meeting, and initiated  without the  Defendants following the procedures established in the rules, regulations, statutes, supreme court rules, and applicable precedent.

334.    In Mr. Mirch's case the initial charges were  invalid as Defendants attached a short statement to Judge Hardesty's order which was never tested by proper discovery, motion to dismiss, and motion for summary judgment.

335.   The specific legal harm was not disclosed to Plaintiff as required under California, Nevada and United States constitution. Accordingly, Plaintiff did not have proper notice of all of the charges made again him. As a result, Mr. Mirch has not been allowed to defend against these charges.  Since proper notification was not given, Mr. Mirch  was not give a reasonable opportunity to prepare for the fabricated charges. Mr. Mirch literally faces new charges on a daily basis without notice and is required to defend immediately without a due process opportunity to respond.

336.    Mr. Mirch is being disciplined for two reasons, to prevent him from

representing clients who are pursuing viable claims against entities represented by preferred lawyers, and to protect the Casinos that falsify markers and IGT which will be required initiate a world wide recall since its boards, CVT's, SAS language as it applies to Mega Bucks are so defective that IGT's customers will refuse to continue to gamble in the state of Nevada.

337.   The State Bar of Nevada - Northern Disciplinary Panel manipulated the composition of the ad hoc committee which determined whether a hearing was proper.

338.   Mr. Mirch was not provided the name of the members of the State of Nevada- Northern Nevada Disciplinary Panel  in order to create an adverse panel that would not fear retribution for their acts to protect these Defendants.

339.   The initial members were not qualified to make a decision as to whether Mr. Mirch should be disciplined as the State Bar failed to seek any evidence supporting Mr. Mirch's position, refused to provide Judge Kosach's transcript which admits that he is acting improperly and adverse to the interests of Mr. Mirch and his clients.

340.   Each of the members that made a decision to hold a hearing against Mr. Mirch had a conflict of interest as economic competitors, protectors of IGT or related entities, and attorneys.

341.   Jones & Vargas, by and through Anne Morgan, Mr. Beesley's Husband, worked for Wild Game Ng and IGT at the same time without disclosing the same. The State Bar of Nevada is aware of this conflict and refuses to take appropriate action for such a conflict.

342.   Sarah Beth Brown was represented by Bruce Laxalt who provided false information to Judge Hardesty, regarding Mr. Mirch's conduct.

343. Bruce Laxalt, Pat Lundvall, Ms. Goedert are all aware that the contract for services that Dr. Frank claimed he never signed nor knew about was in the possession of a private investigator retained by McDonald Carano.

344.   Since no investigation was done by the Nevada State Bar, that document remains in the possession of their investigator or his wife or friend.

345.   Aside from the above due process violations, the Nevada State Bar Association-Northern Nevada Panel also violated Mr. Mirch's due process rights by the following conduct:

1.   Failure to provide the notice of any date of any violation of any ethical rules.

2.   The specific act or omission of alleged substandard ethical conduct by Mr. Mirch.

3.   The resulting negative impact on occurring as a result of the alleged ethical violation by Mr. Mirch.

4.   The objective standard of ethical care applicable under the care of this case.

5.   The Defendants violated Plaintiff's due process by not allowing Mr. Mirch an opportunity to be heard and present evidence prior to the hearing.  Specifically, secret meetings occurred between the initial ad hoc committee to determine whether a hearing was proper.

346.   The Defendants violated California and Nevada statutes for fair hearings. The provisions include the right to an unbiased trier of fact and hearing officer; access to all the documentary evidence to be presented at the hearing; the right to have a record of the hearing; and the right to call, examine, and cross-examine witnesses.

347.   As a result, Mr. Mirch seeks to recover his actual damages as proven at trial, together with his reasonable and necessary attorneys' fees, court costs, and interest as allowed by law.

348.   Mr. Mirch is entitled to punitive damages for the malicious conduct perpetuated by the Defendants in order to protect IGT, its attorneys participating in the

Disciplinary hearing for over 2years, and having a hearing only to prevent a world wide recall of all of IGT's equipment and certain casino's markers.

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF

### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

349.   Plaintiff incorporates by reference all the previous paragraphs as if more fully set forth herein.

350.   The parties had a special relationship that required reliance upon the representations and conduct of each other. The reliance which eventually lead to performance by the Plaintiff was as a result of that same relationship and was reasonable.   Mr. Mirch relied upon the State of Nevada Bar-Northern Nevada Disciplinary Panel.

351.   Mr. Bare has a duty to the Association and its members to investigate and determine when attorneys are using the State Bar as a litigation tool to protect clients which should not be allowed to do business.

352.   As described above, Defendants intentionally breached the covenant of good faith and fair dealing with Plaintiff by making both incorrect and intentionally false disclosures to the State of Nevada Northern Nevada Disciplinary Panel.   The false statements were made by Bruce Laxalt.   The false statements included that Ms. Pat Lundvall and Ms. Goedert had did not know the location of the Brooks/USI assets in 1995.

353.   In 1995 Ms. Lundvall knew that Mr. Savage had located the assets as of 1995, concealed the location until it was safe to provide the same to the public without the Santa Barbara Bankruptcy court knowing that the same were supposed to be provided to the Court.

354.   During 2002, McDonald Carano employees knew that Mr. Savage had located the assets in 1995, concealed their location from Mr. Mirch; and received

those payments to date without paying Mr. Mirch.

355. Upon information and belief, Mr. Savage knew the location of the assets and withheld the same from Mr. Mirch and the Santa Barbara Bankruptcy Court's un-appealed order.

356. Specifically, the Defendants breached the covenant of good faith and fair dealing in the following manner:

    a.   Illegally concealing the location of the Brooks/USI assets from Mr. Mirch.

    b.   Mr. Laxalt provided a false motion to Judge Hardesty to the affect that McDonald Carano did not know where the Brooks/USI assets were located as of 1995.

    c.   Defendants misrepresented the allegations claiming that Mr. Mirch had alleged that Ms. Goedert was involved in the Frank Bankruptcy Fraud while she was in law school. The allegation was meant and did state that McDonald Carano knew where the Brooks/USI assets were located when she became involved in the case.

    d.   Defendants concealed the fact that Mr. Laxalt knew where the Mirch/Frank contracts had been located and withheld that information in order to obtain funds some of which eventually were provided to Judge Hardesty for his political complaint. In 1995 Mr. Laxalt knew where the Brooks/USI assets were located.

    e.   Upon information and belief, Mr. Savage obtained at least one of the Mirch Frank contracts.

357. The breaches of the covenant of good faith and fair dealing are material and intentional.

358. Plaintiff has requested that the breaches be cured on several occasions.

359.   Defendants have refused without excuse to cure the breaches even though notified of the same.

360.   Defendants have intentionally violated the implied covenant of good faith and fair dealing in order to cause Mr. Mirch and Mirch & Mirch severe harm (destruction of his law practice and financial where with all).

361.   As a direct and proximate result of the breach of the implied covenant of good faith and fair dealing of Defendants, Plaintiff has been, and will be in the future, prevented from earning maximum profits from the operation of its business. The exact amount of the lost profits and loss of future earnings is thus far undetermined and accordingly, will be proven at the time of trial.

362.   Plaintiff has retained an attorney to prosecute this action and as a consequence are entitled to reasonable attorney fees and costs related thereto.

363.   As a result of Defendants breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged substantially in excess of $75,000.

364.   In breaching the covenant of good faith and fair dealing, Defendants acted with malice and exhibited a reckless disregard for the rights of the Plaintiffs. Therefore, Plaintiffs are entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF
### (TORTUOUS INTERFERENCE WITH BUSINESS)
### (All Defendants)

365.   Plaintiff incorporates by reference all the previous paragraphs as if more fully set forth below.

366.   Through the actions of the Defendants described herein  and the publication of Mr. Mirch's conduct to members of the legal community including but not limited to Judge Munnell,  as described herein, the Defendants have  tortuously

interfered with Kevin J. Mirch, Esq.'s, business, particularly his relationship with his clients.

367.   Dr. Munnell was told by Pat Lundvall, Esq., that Mr. Mirch was going to be disbarred prior to the time that Judge Hardesty had made his ruling. Judge Munnell made the Statements in 2001 and has continued to do so until the present.  Judge Munnell learned that information from the McDonald firm, and Pat Lundvall.

368.   Defendants, intended to interfere with Plaintiffs contracts with a number of clients including Tom O'Brien and Jack Ferguson.  Judge Munnell knew that O'Brien and Ferguson were Mr. Mirch's clients.

369.   As a result of Dr. Munnell's statements, Mr. Mirch lost legal work from Mr. O'Brien's clients and had to share at least one case with another clients.

370.   The acts, statements, determinations, and recommendations made and acts reported by the Defendants as described herein, were undertaken with malice and with the intention of preventing the contractual relationships between Mr. Mirch and his clients.  These actions were undertaken for the purpose of harming Mr. Mirch and inhibiting competition. Defendants did not and do not possess a privilege, legal justification or excuse which would have condoned such actions. Mr. Mirch's business would not have been lost and  Mr. Mirch  would have obtained substantially greater business, in the absence of Defendants' interference.

371.   As a direct result of Defendants' interference with Mr. Mirch's business, Mr. Mirch  suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in an amount in excess of $1,000,000 dollars. In addition, Mr. Mirch has suffered damages for past and future mental anguish and emotional distress, all to his damage and detriment in the amount of at least $1,000,000 dollars. Further, for the reasons more fully set forth above, Pat Lundvall and Bruce Laxalt intentionally published a number of false statements to Mr. Munnell who republished to other the fact that Mr. Mirch was being

disbarred.

372.   As a result of the malicious conduct by Laxalt and Lundvall, Plaintiff has suffered punitive damages which cannot be repaired.  Accordingly, Plaintiff is entitled to punitive damages.

373.   Defendants were aware of these contractual relationships at the time that they interfered with the same.

374.   Defendants  conduct substantially interfered with Plaintiffs  ongoing business and was intentional.

375.   As a direct and proximate result of the intentional interference with actual contractual relationships Defendants, Plaintiff has been, and will be in the future, prevented from earning maximum profits from the operation of his medical practice. The exact amount of the lost profits and loss of future earnings is thus far undetermined and accordingly, will be proven at the time of trial.

376.   As a result of Defendants  improper conduct, Plaintiff has been damaged substantially in excess of $75,000.

377.   Plaintiff retained an attorney in order to prosecute this action and accordingly, is entitled to reasonable attorney fees and costs related thereto.

378.   In committing the acts herein mentioned, Defendants acted arbitrarily, capriciously, maliciously and with reckless disregard for Plaintiff. Consequently, Plaintiff is entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below:

## FIFTH CLAIM FOR RELIEF

### INJUNCTIVE RELIEF

### (STATE BAR OF NEVADA AND ROB BARE)

379.   Plaintiff incorporates by reference all the previous paragraphs of this complaint as if more fully set forth herein.

380.   The State Bar of Nevada- Northern Nevada Disciplinary Panel has made a decision to hear whether Mr. Mirch should be disciplined for bringing an action against McDonald Carano for threatening Mr. Mirch that if he disclosed to the Santa Barbara Bankruptcy Court or the Bankruptcy Judge that over $4,000,000.00 had been recovered, that she would make sure that Mr. Mirch would be suspended or disbarred from the practice of law.

381.   Mr. Mirch made the disclosure to an agency regulating bankruptcy fraud.

382.   After making that disclosure, Defendants initiated an action, motion to dismiss against Mr. Mirch.

383.   Mr. Mirch made the disclosure in accordance with an order entered by a bankruptcy judge that was not appealed.

384.   Judge Hardesty took over the case as the presiding judge from Judge Adams 2 or 3 days prior to the hearing set by Judge Adams on the motion to dismiss.

385.   Without prior notice, Judge Hardesty changed the motion from one to dismiss to one for Summary Judgment.

386.   Mr. Mirch was not allowed discovery or the opportunity to argue a summary judgment motion at the time.

387.   Judge Hardesty entered an order which harshly attacked Mr. Mirch and referred the case to the State Bar of Nevada.

388.   The State Bar of Nevada through its counsel refused to consider the matter for approximately 2 years until Mr. Mirch was getting ready to litigate a highly contentious matter against IGT.

389.   The IGT matter involved manufacturing fraud, including but not limited to altering serial numbers in order to hide defective CVT's.

390.   As a result of the poor order Mr. Mirch was never allowed to have his case properly argued after discovery.

391.   At the time that Judge Hardesty issues the order against Mr. Mirch, he was

regularly meeting with counsel for IGT and others that Mr. Mirch had successfully won cases.

392.  If Mr. Mirch were allowed to have his matter heard, it would have been discovered that Judge Hardesty was wrong.

393.  McDonald Carano had found the assets which were the subject matter of the underlying claim from Mr. Savage, their investigator in 1995.

394.  In order to obtain a substantial amount of that money, Ms. Lundvall caused Mr. Savage to keep the location of the underlying assets private and blame Mr. Mirch for lying.

395.  If the hearing is allowed to continue without any discovery being allowed Mr. Mirch's legal career could be substantially impacted.

396.  This would cause irreparable harm to Mr. Mirch.

397.  Mr. Mirch's legal career is a unique assets.

398.  Any hearing should be foregone until Mr. Mirch is allowed to litigate the IGT v. Wild Gaming Ng.  If the proceeding is allowed, and Mr. Mirch is unsuccessful, the impact may cause 500 employees to lose their jobs.

399.  As irreparable harm may occur without an injunction preventing the hearing, Mr. Mirch requests that this hearing be prevented until proper discovery and the  Nevada Supreme court can hear this matter.

400.  The State Bar of Nevada has waited 2 years to bring this issue to a hearing and its counsel has stated that Judge Hardesty's order is incorrect, but designed to cause Mr. Mirch as a vendetta that started several years ago.

## PRAYER FOR RELIEF.

.    Plaintiff prays for relief as is set forth below:

1. Damages the exact amount of which will be determined at the time of trial.

2. Punitive damages for the malicious contract caused by the Defendants.

3. For such other and further relief as the Court may deem appropriate.

4.  For injunctive relief which prevents any disciplinary action from occurring until Plaintiff has had an opportunity to receive discovery, including, but not limited to the deposition of Mr. Kennedy and each of the parties in this case.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury in this matter.


Respectfully submitted this 23rd  day of March, 2006

Mirch & Mirch


/s/ KEVIN MIRCH
Kevin J. Mirch, in pro per

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28